AARON GOODMAN, *et al. vs.* JEDIDJAH LODGE, No. 7, OF THE INDEPENDENT ORDER B'NAI B'RITH.

*Corporation—Secession of Members—Beneficial Organization—Confiscation of Property—Endowment plan—Nature of Endowment Certificates—Jurisdiction of Courts over such Certificates—How such Certificates may be Forfeited.*

Whenever individuals or portions of a corporation quit the main body, they leave all the rights and funds of the corporation which remains in its perfect character.

The individuals who have left an incorporated society and formed a voluntary one, cannot maintain a suit to recover the corporate funds; more especially when that corporation remains entire and in full possession of all its rights.

Whatever powers the higher lodges of a beneficial organization may have to make rules or laws for the government of the Subordinate Lodges, and the discipline of their members, the Courts can never recognize as valid any rule or law so made, the effect of which is to *confiscate property*, or arbitrarily to take away *property rights* from one set of members and give them to another set; nor will the Courts allow, or recognize the enforcement of any such rule when its enforcement will accomplish, and is designed to accomplish any such result.

Under the endowment plan of a beneficial organization a book of endowment certificates was furnished to each Subordinate Lodge. One of these certificates was issued to each member, and stipulated for the payment of $1000, upon his death, to his widow and chil-

dren, if he left any, and if not, then to a beneficiary to be desig-
nated by him, whose name must appear in the body of the instru-
ment. HELD:

1st. That such certificates differ in no substantial point from ordinary
life insurance policies, issued by ordinary life insurance companies.

2nd. That the death dues, and contributions to the sinking fund are
no more nor less than premiums exacted as in ordinary cases, by
the payment of which the policies are kept alive.

3rd. That if an organization like this chooses to go into that kind of
business it must expect that the Courts will deal with and adjudi-
cate the rights of the policy-holders upon the same principles of
equity and justice that they apply in the usual and ordinary cases
of life insurance contracts.

4th. That policy-holders who have paid and are willing to pay their
premiums or contributions, and are otherwise in good standing in
their particular lodge cannot have their policies forfeited.

5th. That on the other hand such policies may be lawfully forfeited
(and most commonly are) by the refusal or neglect of the insured
to pay the stipulated premiums.

APPEAL from the Circuit Court of Baltimore City.

The appellants filed their bill against the appellee, an
incorporated beneficial organization, asking for an injunc-
tion to restrain the appellee from using any part of the
funds contributed by the appellants, then in the hands
of said appellee, or which were in its hands at the time it
ceased to have the right or power to act as a constituent
of District Grand Lodge, No. 5, and as a part of the Gen-
eral Order, while the connection of the said appellee with
the General Order, under its laws and Constitution re-
mained severed, or from using the appellants' share of said
funds as a separate and independent organization, distinct
and separate from said General Order; and claiming that
the appellants were entitled to an account to ascertain
what part of the money in the hands of the said appellee
at the time it ceased to have authority and power to act
as a constituent part of said General Order under its laws

and Constitution belonged to them, and to have a decree requiring the payment thereof to each of the appellants. This appeal is taken from the decree of the Court below (PHELPS, J.,) dismissing the bill of complaint. The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT, STONE, MILLER, ROBINSON, IRVING, and BRYAN, J.

*M. R. Walter,* and *Charles Marshall,* for the appellants.

*Daniel Greenbaum, Henry F. Garey,* and *Wm. Pinkney Whyte,* for the appellee.

MILLER, J., delivered the opinion of the Court.

This is another case growing out of the controversy between the minority and majority of the members of Jedidjah Lodge over the funds of the Lodge, the history of which is given in the case of *District Grand Lodge vs. Jedidjah Lodge,* 65 *Md.,* 236. In stating the facts in that case we purposely abstained from any comment upon the conduct of either party, in the hope that our decision would put an end to the litigation, and that the breach would be healed by time and reflection, especially when the minority found that the fund was entirely safe, and would be devoted to the same general *benevolent purposes* for which it was raised, even if it remained in the hands of the Lodge. But in the present case, it becomes necessary to say, that we fully concur in the views expressed by the learned Judge of the Court below, " that the severance between this Lodge and the General Order, which forms the basis of the equity invoked, must appear to have occurred otherwise than by the fault of the complainants, for it is quite apparent that the machinery of a Court of equity will not be set in active motion for the

purpose of enabling parties to take advantage of their own
wrong." We are constrained to say that in our opinion the
conduct of the minority throughout this whole controversy
has not been such as to challenge for their present claim
the favorable consideration of a Court of equity. When
the controversy first arose on the 6th of July, 1884, as to
whether the bonds in which the funds of Jedidjah Lodge
were invested, should, in obedience to the order of the
Grand Lodge, be so registered as to transfer the equitable
title to the bonds to the latter Lodge, the minority upon
being out-voted on that question, instituted this litigation
at once and with unseemly haste. We say this haste
was *unseemly*, in view of the fact that they were fellow-
members of a Lodge, which had taken for its motto " Be-
nevolence, Brotherly Love and Harmony," which by one
of its fundamental Articles " seriously enjoined " its mem-
bers, " not to bring suits against each other before a pub-
lic Court of justice before an amicable settlement has been
attempted before the tribunal " to be created by the Lodge
itself, and where all were engaged in a noble and benefi-
cent work of charity. One would naturally suppose that
in such a case some effort at persuasion and conciliation
would have been made before a resort to litigation was
had; that even the District Grand Lodge would have
received with some *deference* the objections of a majority
of the two oldest, largest, and most important Lodges in
the District, upon a question involving the title to nearly
$20,000 in money and securities, and would have given
them at least some *consideration*, and not have met them
with precipitate and harsh action. But only four days
after the vote in the Lodge was taken, the minority filed
a bill in the Court below of a very remarkable character.
They charged that the five trustees, and the treasurer of the
Lodge, in whose custody and keeping these securities and
money were, had conspired with certain members of the
Lodge, other than the complainants, *fraudulently* to deprive

the Lodge and the complainants of these funds, and *fraudulently* to divert them from the trust purposes for which they had been placed in their hands; that they had withdrawn the funds of the Lodge deposited in bank without any legal authority, and had openly and publicly declared that they had severed their connection with the Order, and, that they intended to retain all the funds, and use them for such purposes as they and their co-conspirators might agree upon.    These were the sole *charges* (and they were afterwards shown to be unfounded) made in this bill against any of the members of the Lodge, and these *officers* were the sole defendants.    But more than this, the individual complainants, without any authority to do so, used the name of the Lodge itself, and made it a party complainant with them.    In this bill they said not a word about the vote in the Lodge which had just taken place, gave the Court no information about the controversy over the title to and custody of these funds, and made no disclosure of the grounds upon which the majority rested the claim of the Lodge to continue the holding of such title and possession, though all these facts were perfectly well known to them at the time.    The bill therefore when it was presented to the Judge for an injunction and a receiver, appeared to him to be simply a bill in which the Lodge itself, as well as the complainants, was asking relief against the *fraud*, actual or contemplated, of its own officers, and certain unnamed members of the Lodge, who were their co-conspirators in the perpetration of the fraud. It made a case which was unquestionably within the jurisdiction of a Court of equity, and the Judge, according to the usual practice in such cases, was authorized, if not bound, to grant a preliminary injunction and appoint a receiver, as he did.    But in view of what took place out of Court immediately afterwards, and of what was developed in the subsequent progress of the litigation, he was quite right in saying, when the case was brought to

a final hearing, that his intervention in the first instance was procured upon a bill which contained " both the *suggestio falsi* and the *suppresio veri.*" Three days after this bill was filed came the suspension of the Lodge, and as speedily as possible thereafter the *forfeiture* of its conventional charter by the District Grand Lodge at a special meeting called for that purpose in the City of Baltimore. Then came the supplemental bill by the District Grand Lodge claiming the *whole* of these funds by virtue of such *forfeiture.* In this bill Jedidjah Lodge was made a defendant, together with all its members. The Lodge itself and a majority of its members in their answers resisted the claim, but the minority *assented* to it. From all the facts and surrounding circumstances disclosed by the evidence in that case, we cannot doubt, but that it was the plan and purpose of the minority and of the District Grand Lodge, not only to get possession of these funds and securities, but to cut off the majority from membership in the Order, and deprive them of all interest in the fund, which they had contributed equally with the minority, and not one cent of which had been contributed by any one else; and that they did this simply because the majority had insisted upon the right of the Lodge to hold on to its own funds and property. That was the case which was before us in 65 *Md.,* and all that need now to be said about it is, that in our opinion the claim there set up was unjust and inequitable. The District Grand Lodge having failed in this attempt to get possession of the whole fund, now drops out of the litigation, and the minority have filed. the present bill in their individual names, in which they claim their *proportionate part* of it, and ask for an injunction, and an account to ascertain their share. But the present record discloses the fact that the complainants have long since *voluntarily seceded* from Jedidjah Lodge, and formed a new Lodge in connection with and under the authority of the District Grand Lodge. They did

this as early as the 7th of September, 1884, shortly after the forfeiture had been decreed, and not only long before the appeal which Jedidjah Lodge had taken from that decree, had been decided by the appellate tribunal of the Order, but before the supplemental bill to which they were made parties was filed, and *while they were actively carrying on the litigation under their original bill as members of the Lodge.* They say in their present bill that Jedidjah Lodge had ceased to be a constituent member of the General Order, through "no fault of theirs," but to this we do not agree. On the contrary, it is our opinion that the facts clearly show, that this unjust and arbitrary forfeiture was brought about by their active agency, and that their conduct throughout the whole controversy has been pervaded with bad faith, both to the Court and their brethren of the majority. When we consider the fact that the minority well knew that the sole controversy between them and the majority, was in regard to the right of possession and title to these funds, and then look to the character of the original bill by which the injunction and receiver were obtained, and then to what immediately followed through their agency out of, and without the knowledge of, the Court whose jurisdiction they had invoked, to the undue haste in obtaining the forfeiture which they supposed would irrevocably decide the question of title and possession in their favor, but which they knew would, at the same time, inflict a gross wrong and injustice upon the majority, who were innocently and honestly contesting the question in Court, we are forced to agree with the learned Judge of the Circuit Court, that the transaction throughout was so palpably inequitable, that no Court of equity could permit any rights to be deduced from it by any of the parties, who were directly or indirectly responsible therefor, and that he was right in dismissing the present bill for the reason that the complainants were so responsible. In the criticism thus made upon the con-

duct of the parties, no reflection is intended to be cast upon the professional conduct of the learned counsel engaged on the part of the complainants in any stage of this litigation. They have conducted it from its inception with zeal and ability, and we are quite sure they have acted throughout solely upon the representations made to them by their clients.

But we do not choose to rest our decision of the case upon this ground alone. In the former case we said that the charter granted by the State to Jedidjah Lodge, was still in force, and that the Lodge *had the right to hold the funds in controversy* under the corporate powers conferred by that charter, which was entirely unaffected by the forfeiture of its conventional charter. We see no good reason for retracting these views, or for holding that they are not applicable in the present case, notwithstanding the very able and ingenious arguments by counsel for the appellants on this subject. The Act of 1852, ch. 231, made provision for the incorporation of any seven or more persons for *beneficial or benevolent purposes,* gave the corporate body, when so created, the usual powers of such corporations, including those of perpetual succession and of holding property, not exceeding at any one time, $50,000, with power also to *change, alter or amend* the articles and conditions of their association, and reserved to the General Assembly the power to alter, amend or annul the charter of any corporation formed thereunder. On the 16th of December, 1853, fourteen persons availed themselves of the privilege granted by this Act, and formed a corporation "for charitable purposes," and claimed for themselves and their successors, the benefit of the Act and of any Act supplementary thereto. The corporate name they assumed, was "The Jedidjah Lodge, No. 7, of the Independent Order B'nai B'rith." It is true, that when this corporation was formed, this Lodge was a subordinate Lodge forming part of the General Order, and by several

of the articles of association, it was bound to observe and enforce the rules and regulations of the Grand Lodge of the District. But the Courts must look to the powers which the State has, by its laws, conferred upon this corporate body. Among them, as we have said, is the power to change its articles of association, given not only by the original Act of 1852, but secured by the present corporation laws. *Rev. Code, Art.* 40, *secs.* 42 and 180. Such a change of its articles as would completely sever all connection between this corporation and the District Grand Lodge or the General Order, could be made, without, so far as we can perceive, affecting injuriously any substantial property or pecuniary rights of any of the corporators or members, and it is such rights only that the Courts can consider. But even if such change could not be made without inflicting such injury, and if the corporation has wrongfully refused to obey the order of the Grand Lodge, still, this would only be cause for the annulment of its charter by the Legislature, or for proceedings against it, as provided by the corporation laws. *Rev. Code, Art.* 67, *secs.* 1 to 9. A corporation can also be dissolved, but the mode for doing that is likewise provided by law. *Rev. Code, Art.* 67, *secs.* 10 to 22. But this bill is not a proceeding under either of these provisions of the Code, and the Court has no power upon such a bill, either to dissolve the corporation, or to forfeit its charter, or to correct any supposed misuse or abuse of its corporate powers, and it seems to us, that the successful prosecution of one or the other of these remedies is essential to the relief asked by these complainants, even if they are entitled to it upon any ground. But in the view we take of the case, they are not, upon the facts contained in this record, entitled to any relief whatever. The law applicable to the case is, in our opinion, correctly stated by the Chancellor in *Smith, et al. vs. Smith, et al.,* 3 *Desau.,* 557. That was a case similar in many of its features to this. The fund

there in controversy, belonged to an incorporated Lodge of Masons, and was claimed by those who had, in effect, seceded and formed a new Lodge. In the course of his opinion, the Chancellor said : "It has been stated that the fund in controversy was raised chiefly by the contributions of those Lodges which have adhered to the change made by the Grand Lodge in Charleston, and that the Lodges who adhered to the ancient charter, had contributed but little to the fund. This may be, and I believe is correct, but it cannot have any influence upon this cause, for whenever individuals or portions of a corporation quit the main body, they leave all the rights and funds of the corporation which remain in its perfect character.   *   * I am satisfied that the individuals who have left an *incorporated society* and formed a voluntary one, cannot maintain a suit to recover the corporate funds, more especially as that corporation remains, in my judgment, entire, and is in full possession of all its rights." The present case is unlike that of *Watson vs. Jones*, 13 *Wallace*, 679. In that case the trustees, both by the Act incorporating them, as well as by the rules of the church, were the mere *nominal title-holders and custodians* of the church property, and others could be elected by the congregation to supply their places once in every two years. In the use of the church building and property, for all religious services and ecclesiastical purposes, the trustees were under the control of a church body called the Church Sessions, and the Court held, that the question, who constituted the Church Sessions and the congregation entitled by their religious faith, to the use of the church building for religious purposes, was a matter proper, to be decided by the highest judicatory in the church itself, which in that case, was the Presbyterian Church. In such a case, the Court said the preponderating weight of judicial authority in this country, and under our system of laws was, that the legal tribunals must accept as final and binding the de-

cisions of the highest judicatory in the particular church, upon questions "of discipline, or of faith, or ecclesiastical rule, custom, or law." But this corporation is of a very different character, created for a very different purpose, and vested with very different powers from those conferred upon the church trustees by the corporation laws of Kentucky in that case. And much less does the case before us resemble, either in its facts or in the principles decided, the memorable one of the "Methodist Book Concern," (*Smith vs. Swormstedt*,) reported in 16 *How.*, 238. There a great church organization had in its General Conference agreed upon a plan of separation into a church north and a church south, which plan carried with it a *pro rata* division of the common property belonging to the whole church, including that of the "Book Concern," and the bill was filed to enforce that division. The Court simply held that the plan of separation was validly adopted, and that its effect as to the division of the property, was such as the complainants insisted upon. The other cases cited by counsel for the appellants do not appear to us to have any more direct bearing upon the questions involved in the present case than these two, and we, therefore, deem it unnecessary to review them. Whatever powers the higher Lodges in such an organization as this may have, to make rules or laws for the government of the subordinate Lodges and the discipline of their members, we think it quite certain that the Courts can never recognize as valid, any rule or law so made, the effect of which is to *confiscate property*, or arbitrarily to take away *property rights* from one set of members, and give them to another set; nor will the Courts allow or recognize the enforcement of any such rule when its enforcement will accomplish, and is designed to accomplish, such a result.

But there is another view that may be taken of the case, so far as the "Endowment Sinking Fund" is concerned. In our opinion in the former case, we said that the endow-

ment plan (the adoption of which has given rise to the present litigation,) was practically a system of mutual or co-operative life insurance. A re-examination of that plan has convinced us of the soundness of this position. Under it a book of Endowment Certificates was furnished to each subordinate Lodge, and one of these certificates was issued to each member; and it stipulated for the payment of $1000 upon his death to his widow and children, if he left any,. and if not, then to a beneficiary to be designated by him, whose name must appear in the body of the instrument. Such certificates differ in no substantial point from ordinary life insurance policies issued by ordinary life insurance companies. The death dues and the contributions to the sinking fund are nothing more nor less than premiums exacted as .in ordinary cases, by the payment of which the policies are kept alive. If an organization like this chooses to go into that kind of business, it must expect that the Courts will deal with, and adjudicate the rights of the policy-holders upon the same principles of equity and justice that they apply in the usual and ordinary cases of life insurance contracts. Policy-holders who have paid and are willing to continue to pay their premiums or contributions, and are otherwise in good standing in their particular Lodge, cannot have their policies forfeited, and this, as we understand it, is the position in which the majority of the members of Jedidjah Lodge now stand. On the other hand, such policies may be lawfully forfeited (and most commonly are) by the refusal or neglect of the insured to pay the stipulated premiums, and that is the position in which these complainants stand. There was no *legal* impediment in the way of their still adhering to this incorporated Lodge after its conventional charter was forfeited, and at the same time forming a voluntary Lodge in connection with the general Order, but they have not only voluntarily seceded· from the Lodge, but have repudiated all connection with it, and since their

Goodman, *et al. vs.* Jedidjah Lodge, No. 7, &c.

secession have refused to pay any dues or contributions thereto. By this action they have clearly and justly forfeited their Endowment Certificates or policies, and consequently all just claim upon the fund by which the payment of such certificates or policies was protected or secured.

Entertaining these views of the case, we must affirm the decree dismissing the bill.

*Decree affirmed.*

(Decided 16th March, 1887.)


BRYAN, J., filed the following opinion:

I concur in the affirmance of the decree in this case. But I do not join in the censures which have been made in the opinion of the Court on the conduct of the complainants who filed the bill. They instituted this proceeding in the maintenance of their legal rights as they appeared to them at the time. This Court does not sustain their views; but I do not condemn them for bringing their cause before the proper tribunals for adjudication. They entertained certain opinions in respect to the matters in controversy, and they instituted proceedings in a legitimate manner for a proper decision of the questions involved. In stating their case, they doubtless presented it in the mode which they believed that a proper defence of their rights required. They had an unquestionable right to pursue this course. We have felt it our duty to decide the questions against them; but I do not think that their motives ought to be impeached.

(Filed 2nd June, 1887.)