## SUPERIOR COURT OF BALTIMORE CITY

Filed January 10, 1893.

### STATE OF MARYLAND

### VS.

### THE ORDER OF THE INTERNATIONAL FRATERNAL ALLIANCE OF BALTIMORE CITY.

*Attorney-General John P. Poe* for plaintiff.

*William Pinkney Whyte* and *Henry Duffy* for defendant.

WICKES, J.—

At the suggestion of the Governor, the Attorney-General has filed a petition in this Court against "The Order of the International Fraternal Alliance of Baltimore City," setting forth that it is conducting its business in violation of the laws of the State, misusing and abusing its charter, and praying the Court to enter a decree of forfeiture against it, and appoint a receiver to take charge of its affairs.

The defendant corporation was incorporated in 1889, and declared itself to be "a corporation for social or fraternal beneficial purposes, or both." It at once proceeded to organize and adopted a constitution and general laws, which are made part of this case. In pursuance of this constitution, it has issued a very large number of endowment and death certificates, which, according to the petition filed in the name of the State, constitute it an endowment insurance company on the assessment plan, bringing it directly within the prohibition of the State law in reference to such organizations.

The answer filed by the company, and which the act requires shall "fully set forth all the defenses upon which it intends to rely," avers that it "is strictly a beneficial organization, paying sick, accident, death and maturity benefits to its members; that these members have a voice and representation in electing its officers and trustees, and that it is conducted according to a ritual, a copy of which is filed, &c."

It further denies the allegation of the petition and "avers that its business is not substantially or otherwise in the nature of an insurance business, and is not conducted in violation of the code, and that its business is not conducted with a view to profit by its officers and members." It also "denies that its scheme is practically an endowment insurance on the assessment plan, but is, in fact, the payment of various benefits through organized

lodges, operating under a grand and supreme lodge." It further avers "that it is an order having ritualistic work and ceremonies in its lodges and assemblies, and is expressly exempt from the supervision of the Insurance Department". The defenses therefore which the defendant interposes are:

1. A denial that it is doing substantially or otherwise a life or endowment insurance business; and

2. That it is exempt from the operation of the law, because of its lodge system and its ritual.

If it is not doing a life insurance business, "substantially or otherwise," there is no necessity to invoke the aid of the proviso of the Act in its behalf; but if it is, the question must then be considered as to how far this proviso can be relied upon to impart immunity to acts, which would otherwise be unlawful.

Sec. 127 of Art. 23, of the Code, so far as it affects this case, provides as follows:

"Any person, body politic or corporate, partnership or association, who or which shall make, negotiate or solicit within this State any contract of insurance, whether of adult or infant, or by whatsoever title the same may be known, or shall affect an insurance or insurances * * * or shall do any business of insurance of any kind, or make any guaranty, contract or pledge for the payment of annuities or *endowments*, or money, whether the amount thereof be fixed or contingent, to the families of or representatives of any policy or certificate holder or the like; or shall advertise, or circulate any card, circular, notice, or open or keep any office for the transaction of said business, except an insurance broker duly licensed, without fully complying with all the provisions of this sub-title to this article, shall be subject, &c. * * * And the term insurance company as used in this article, shall be taken to embrace every corporation, association, partnership or individual engaging in such business; and every such corporation, association, partnership or individual making any engagement for the payment of any money or other benefit in the event of sickness, accident or death or other contingency, either to the member, policy or certificate holder or whatsoever name the same may be known, or to their families or representatives * * * shall be deemed and taken to be a life insurance company within the meaning of this article, and shall be subject to all the requirements of law applicable to said life insurance companies.* * * Provided also that nothing herein contained shall be construed to apply to the granting of relief or benefits to members of their families by any societies of a purely or exclusively religious, charitable or benevolent description not operated with a view to a profit by its officers or members; *nor to orders or associations having ritualistic work and ceremonies in their lodges, councils or societies;* provided also that the business commonly known as industrial insurance, or on the weekly payment plan, shall not be permitted to operate under the guise of privileges of the orders as exempted in this Article."

The constitution placed in evidence by the defendant, states that the object of the Order is "to benefit its members *morally, intellectually* and *financially.*

The "General Laws" of the defendant company provide for two distinct funds—the benefit fund and the general fund. From the former, "all sick, accident, *endowment*, death or disability claims" are paid; from the latter, which constitutes the expense fund of the Order, the general expenses, including officers salaries are paid. The benefit fund consists of all "monthly payments made by the members either of dues or assessments." The general fund consists of "all receipts from entrance fees, sale of supplies, per capita tax, fines and other sundry fees."

The benefit plan, which is known as the "Golden Cycle" class, pays benefits as follows: "1. A weekly benefit of $7 upon each certificate in case of sickness. 2. A death benefit of $80 per annum or pro rata thereof for an unexpired portion of the year. 3. A *maturity* (during life) benefit of $700 at the end of each seven years." The illustrative "Table" appended, shows the operation of the "endowment" or "maturity" policy issued by the company, and which seems to form the basis of its entire financial scheme.

1. The endowment feature.

The policy entitles the holder to receive at the end of seven years the sum of $700.

The member entitled to receive this sum, is required to pay an initiation fee of $5, and to pay monthly assessments the first year of $2.25, after that the assessments are $1.25 each; but the number is not specified. Dues are also charged amounting to $4 per annum.

2. Option plan.

This plan is the same as the endowment plan with this difference; that at the option of the policyholder at the end of three years he can draw $200; at the end of five years $200 additional, and at the expiration of seven years the balance $300. The cost of this policy, is for the first year, assessments amounting to $2.50 a month, and after that each assessment is $1.50 under this plan.

3. Death benefits.

Upon both the above plans a death benefit of $80 per annum or pro rata thereof for unexpired portion of the year is paid.

4. Sick benefits.

The sick benefit of $7 per week, for a certain number of weeks, is deducted from the above policy at the end of the seven years, and interest at the rate of 6 per cent. per annum is charged upon the amount paid.

5. The order also issues a small certificate, known as the "Junior" for $250, payable at the end of seven years.

This entitles the holder to $4 per week sick benefits and in case of death, his beneficiaries are entitled to a death benefit of $30 per annum. Costs. The assessments for the first year are $1.00 and thereafter 50 cents.

6. Any person between the ages of 17 and 67 may join the Order, except in the "Junior" class, from which they are taken from the age of 12 years.

The endowment or maturity policy has also a surrender value, for Sec. 6, of Art. 17, provides that, "any member holding a seven year certificate may surrender the same at any time after three and a-half years from the date thereof, and receive as a cash surrender value the sum of one-half of all assessments and monthly dues which have been paid to the order, less sick benefits drawn with 6 per cent. interest added."

There is no limitation prescribed by the constitution as to who may be a beneficiary. There is therefore no necessity that the beneficiary should be a member of the certificate holder's family, or in any way dependent on him. A member may also change his beneficiary at any time. A member may also assign his certificate to any other member of the order. So that whatever may be the provision for the "Moral and Intellectual" development of the members, there is no doubt as to the financial benefit to be derived from the plan. A member first pays his initiation fee of $5. He takes out a seven year endowment certificate, which costs him in assessments the first year $27. The cost per annum afterwards, it was asserted in the argument and not denied, will average about $36, or $216 for the six years. His dues will be $4 per year, or $28, and his interest account about $34, making his total payments amount to about $310, for which he is promised $700 at the maturity of his policy.

If he suffers from illness he is allowed $7 per week, for a certain number of weeks each year, subject, however, to the approval of the medical examiner, but these payments are deducted from his policy and interest charged upon them at the rate of 6 per cent. per annum. If he dies his beneficiary, who may be anyone he chooses to select, receives $80 per annum or a pro rata part of it. He may surrender his policy when half expired and receive half that he has paid in. He may assign it to any other member or he may make or change his beneficiary, without regard to the relation he bears to such beneficiary.

In other words, he has all the advantages of those who hold policies in the regular insurance companies, except that this order pays but a small proportion at death, while the old line companies pay the full amount; but the amount promised to be paid in the event of living and keeping his policy alive is vastly more than the regular companies are able to return. When asked how this can be done we are told by "lapses" and "assessments." The unfortunate members drop out, the others reap the benefit of what remains in the treasury of the Order.

Whether this scheme can be successfully worked out when, after seven years have passed, the certificates mature, is not the inquiry. But, if it can, in what proper sense can it be called

benevolent or beneficial, resting, as it must, for success upon the misfortunate of its own members.

If this is not a "contract of insurance," including both "adults and infants," if it is not a contract for the payment of "endowments or money," both "fixed and contingent," I am at a loss to understand what the plain language of the law is intended to mean.

The "Benefit Plan" of this Order is practically an endowment insurance plan, with features, rather incidental than primary, of sick and death benefits.

So obviously indeed, is the business done by this Order within the inhibition of the act, that the learned counsel who appeared on their behalf, have practically abandoned, in the brief submitted since the argument, so much of the defense alleged in their answer, as denies that the company is doing an insurance business "substantially or otherwise," and now rely upon the proviso, which excepts from its operation, "orders or associations having ritualistic work and ceremonies in their lodges, councils or societies."

It cannot be pretended that this Order falls within any other clause of this proviso, for it is surely not "exclusively religious," "exclusively charitable" or "exclusively benevolent." Just as certainly is it operated to the "profit of its officers" who are paid salaries, and in certain contingencies to the enormous "profit of its members," whether that is the "view" of the Order or not.

So that its defense must at last depend upon whether an association which confessedly negotiates contracts of insurance—issues endowment policies, with incidental sick and death benefits, which policies have a surrender value, and may be taken out in the name of any beneficiary, and assigned to any member of the order, and which is not exclusively charitable religious or benevolent in its purposes, but is operated to the benefit of officers and members, can escape the penalty of the law, by simply clothing itself with a ritual, and doing its work in lodges. This is distinctly the proposition, with which the defendant is brought face to face, and judgment must follow the answer.

The distinct prohibition of the law must be borne in mind. It forbids "any person, body politic or corporate, partnership or association" from "effecting or pretending to effect an insurance or insurances," or from "doing any business or insurance of any kind or making any guaranty, contract or pledge for the payment of annuities or *endowments* or money, whether the amount thereof be fixed or contingent." And according to the proviso, not even can this be done, by societies of a purely religious, charitable or benevolent description for the relief or benefit of members of their own families, if it is also done with a view to the profit of its officers or members. Again we find as part of the proviso "that the business commonly known as industrial insurance, or on the weekly payment plan, shall not be permitted to operate under the guise of privileges of the orders as exempted in this article." In other words, the line is distinctly and clearly drawn throughout the proviso, between societies formed upon the basis of benevolent, charitable and religious associations whose honored work it is, to help the sick and suffering, and relieve the poverty of distressed families, and other associations which wear the livery of such Orders, the better to serve the purposes of those who organize and conduct them.

Can it be possible, then, that what is prohibited by the act itself, and clearly prohibited by the proviso, can be accomplished by any five citizens of the State, who may see proper to form a corporation and demand a charter, for the Courts have no right to refuse their approval, if the application is in legal form, and then, by the simple devices of a ritual and a lodge, escape all the provisions of our insurance laws, and do the most profitable insurance business of which we have any knowledge, without let or hindrance on the part of the State authorities. I am quite sure the legislature never intended to stultify itself in this fashion.

To give this clause in the proviso the construction we are asked to place upon it, is to undo all that the act was designed to accomplish, to make the lawmaking body of the State elaborate an insurance system, and then, in a breath, say, but this shall not apply, if you will formulate a ritual

and assemble in a lodge. Such a construction, I think, is wholly inadmissible. And now without entering upon the broad field of decision elsewhere, for the questions at issue in this case, must be decided upon our own statutes, it is nevertheless proper to advert briefly to the cases relied upon by the defendant. In the Commonwealth vs. Equitable Beneficial Association, 18 Atlan. Rep., p. 1113, a case decided by the Supreme Court of Pennsylvania, and so much relied on by the defendant, the association was organized under the Section of the Act of 1874, which permits the "maintenance of a society for beneficial or protection purposes to its members from funds collected therein." The Court, after distinguishing between the objects of beneficial societies and insurance companies, holding that the one is to indemnify for loss, while the other is to accumulate a fund from the contributions of members to be used in their own aid or relief in the misfortunes of sickness, injury or death, then adds, "such societies have no capital stock; they yield no profits and their contracts although beneficial and protective altogether exclude the idea of insurance, &c." The Court simply decides an abstract question, for it goes on to say, "we are wholly without information as to the business in which the defendants are engaged, * * * or indeed that they are engaged in any business at all." The case therefore decides nothing.

In Farmer vs. State, 69 Texas 563, a quo warranto proceeding against a Benevolent Society issuing certificates, as the brief states, "similar to those of defendant," the Court held that it was not a benevolent association, but an insurance company, and forfeited the charter.

The Texas Statute divides corporations into' (1) Religious; (2) For Charity and Benevolence; and (3) For Profit. Much resembling our own in this particular, as I understand it. In Commonwealth vs. Wetherbee, 105 Mass. 160, the association issued certificates like those of the defendant. It was held that they were insurance policies, and the company not having complied with the insurance laws, the agent was liable to indictment. Since then it is said the statutes have been amended, and fraternal societies con-

ducting business with lodge system are exempt from its provisions. No decision, however, has been shown us, construing the new law.

And so with other cases to which I need scarcely refer, but come at once to our own decisions.

In District Grand Lodge vs. Jedidjah Lodge, 65 Md. 237, the question arose over an attempt of the Grand Lodge to forfeit the charter of the defendant and appropriate its funds to their own use. Miller, J., in delivering the opinion of the Court, describes the original benevolent purposes and character of the order, and then comments on the endowment plan, which "after a time and after considerable opposition" the order adopted. "By this plan," says the Court, "the sum of $1,000 was to be paid to his widow and children upon the death of a member, thus practically introducing *a system of mutual co-operative life insurance."* The Court then describes the manner in which the money was to be raised by assessments to pay off these policies, which in its details very much resembles the plan of this defendant.

The case was again before the Court later on, 67 Md. 127, and the same distinguished justice again delivered the opinion in which he says, "But there is another view that may be taken of the case' so far as the 'Endowment of Sinking Fund' is concerned. In our opinion in the former case, we said that the endowment plan was practically a system of mutual or co-operative life insurance. *A re-examination of that plan has convinced us of the soundness of this position.* Under it a book of endowment certificates furnished to each subordinate lodge, and one of these certificates was issued to each member, and it stipulated for the payment of $1000, upon his death to his widow or children if he left any, and if not, then to a beneficiary to be designated by him, whose name must appear in the body of the instrument. Such certificates differ in no substantial point from ordinary life insurance policies issued by ordinary life insurance companies. The death dues and the contributions to the sinking fund are nothing more or less than premiums exacted as in ordinary cases, by the payment of which the policies are kept alive. If an organization like this chooses to go into that kind of

business, it must expect that the Courts will deal with and adjudicate the rights of the policy holders upon the same principles of equity and justice that they apply in the usual and ordinary cases of life insurance contracts."

It is contended that this decides nothing at issue in the case before us And strickly speaking, that is true, for the form and purposes of the suit, were different. But it does decide with emphasis and upon "*re-examination*," that endowment policies, far less objectionable than those, issued by the defendant association in this case, are practically life insurance policies, and thus a side light, strong and clear is thrown upon the immediate question before us.

The question then recurs, whether an Order issuing such policies, are protected by their ritual and their lodge, from the provisions of a law which otherwise, they clearly violate.

That question I have already answered in the negative. The two Kansas cases cited by the learned Attorney-General, are almost identical with the case before us. 35 Kansas, pp. 51 and 253. They decide in a word that a contract by an association to pay at certain stated periods of time certain sums of money as endowments to living members, or in case of their death, to pay certain other sums as benefits to their beneficiaries, is life insurance both as to the endowments and the benefits. And they further decide that the excepted associations "under the supervision of a grand or supreme lodge," refer only to secret associations, such as Freemasons, Odd Fellows and the like.

It is said that such a conclusion as has been reached in this case will affect disastrously large and varied interests. It will, of course, be a matter of profound regret that those who have innocently gone into this business, if such there be, should suffer any loss. But, whatever the consequences may be, it is enough for the Courts to know that *ita lex scripta est.* If hardship is involved, the remedy lies with the legislature, not the Courts. Courts neither make nor unmake laws. They simply declare what they mean and administer them as they find them. It is a satisfaction to know that if we are in error, the Ap-

pellate Court will correct us, and establish a precedent for the guidance of this and all kindred associations.

Being then of opinion that the defendant association is misusing and abusing its charter, that it is doing an insurance business, without complying with the insurance laws of the State, that it is not excepted from the operation of those laws, because of its ritual and its lodges, and that this insurance business lies at the foundation of its entire financial plan, and is so interwoven with its operations, that it cannot be separated from the other parts without destroying the whole, we shall enter a decree of forfeiture against it, as prayed by the State.