(Filed 24th June, 1886.)

DISTRICT GRAND LODGE, No. 5, INDEPENDENT ORDER OF B'NAI B'RITH *vs.* JEDIDJAH LODGE, No. 7, INDEPENDENT ORDER OF B'NAI B'RITH.

*Benevolent Societies — Forfeiture of Charter — Right to Funds.*

The Independent Order of B'nai B'rith, organized for benevolent purposes, has numerous lodges in different States of the Union. The primary or subordinate lodges are grouped into districts, over

District Grand Lodge, &c. *vs.* Jedidjah Lodge, &c.

which are district grand lodges composed of delegates elected by the subordinate lodges. Above these is a "Constitution Grand Lodge." There is also an Appellate Court for the settlement of controversies arising within the Order. Among the general laws is one which requires each subordinate Lodge to obey the ordinances, laws and resolutions of the "Constitution Grand Lodge," its District Grand Lodge, and the final decisions of the Appellate Court, under penalty of suspension and forfeiture of their charters. These charters are paper documents emanating from, and issued by, the District Grand Lodges to the subordinate Lodges within their respective territorial limits. Jedidjah Lodge of Baltimore, originally belonged to district No. 1, and in the year 1852, received its documentary charter from the Grand Lodge of that District. Afterwards it fell within the limits of District No. 5, and received a similar charter from the Grand Lodge of that District. In December, 1853, Jedidjah Lodge was *incorporated* under the Act of 1852, chapter 231, and in February, 1870, District Grand Lodge No. 5, was also *incorporated* under the general Corporation Law of 1868, chapter 471. On a bill filed by District Grand Lodge No. 5, against Jedidjah Lodge, alleging that the complainant had forfeited the charter of said Jedidjah Lodge under the laws and Constitution of the Order, and claiming that by reason thereof the funds of said Jedidjah Lodge belonged to the complainant, it was HELD:

1st. That the charter granted by the State to the Jedidjah Lodge could not be forfeited by the Grand Lodge, whether acting in its conventional or corporate capacity.

2nd. That the Jedidjah Lodge held the funds in controversy, and had the right to hold them, under the corporate powers conferred by the State charter, and so held them entirely unaffected by the forfeiture, by virtue of which alone the complainant claimed them.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, RITCHIE, and BRYAN, J.

\* *M. R. Walter, Isidor Rayner,* and *Bernard Carter,* for the appellant.

*Henry F. Garey,* and *William Pinkney Whyte,* for the appellee.

MILLER, J., delivered the opinion of the Court.

It is not our purpose, nor is it necessary, to review in detail the mass of testimony, oral and documentary, contained in, and by agreement made part of, this record. All that need be done is to state briefly the origin of the "Endowment Sinking Fund," over which the controversy has arisen, and its *status* on the 10th of July, 1884, when the original bill in this case was filed.

The "Independent Order of B'nai B'rith," (membership in which is confined to Israelites,) was instituted about forty years ago, and has since increased to such an extent that it now has numerous Lodges in most of the States of the Union. Originally the Order resembled in its main features that of the "Odd Fellows" and other similar voluntary organizations, for benevolent purposes, such as alleviating the wants of the poor and needy, visiting and attending the sick, and protecting and assisting the widow and orphan. The primary or subordinate Lodges are grouped into Districts, over which are District Grand Lodges composed of delegates elected by the subordinate Lodges upon a prescribed basis of representation. Above these is a "Constitution Grand Lodge" which meets once in seven years, composed of one delegate chosen by each Lodge from among its Past Presidents. There is also an Appellate Court for the settlement of controversies arising within the Order. Among the general laws is one which requires each subordinate Lodge to obey the ordinances, laws and resolutions of the "Constitution Grand

---

\* Although present, Mr. Walter took no part in the argument.

Lodge," its District Grand Lodge, and the final decisions of the Appellate Court, under penalty of suspension and forfeiture of their charters. · These charters are paper documents emanating from and issued by the District Grand Lodges, to the subordinate Lodges within their respective territorial limits. The revenue of the entire Order arises, with the exception of occasional voluntary donations, from fees, dues, or assessments levied upon the members of the subordinate Lodges, and the expenses of the higher as well as the inferior Lodges are paid out of the income thus derived.

Jedidjah Lodge of Baltimore was the oldest and largest primary Lodge in this State. At first it belonged to District No. 1, and in 1852, received its documentary charter from the Grand Lodge of that District. Afterwards, it fell within the limits of District No. 5, and in 1867, received a similar charter from the Grand Lodge of that District. This latter District, whose limits were enlarged and changed, now includes the State of Maryland, the District of Columbia, and the States of Virginia, North Carolina, South Carolina and Georgia. There are thirty-four subordinate Lodges in this District, and of all these, Jedidjah Lodge, continued to be the largest in numbers up to the time the litigation in this case commenced. Two other facts important to be stated in this connection, and important to the decision of the questions before us, are that in December, 1853, Jedidjah Lodge was *incorporated* under the Act of 1852, ch. 231, then in force, and in February, 1870, District Grand Lodge, No. 5, was also *incorporated* under the general Corporation Law of 1868, ch. 471.

For a long period after its organization, Jedidjah Lodge divided its income into two funds: 1st, a beneficial fund, devoted to the expenses of the Lodge, the support of sick and distressed members, and for such useful and benevolent purposes as the Lodge might see proper to promote,

and 2nd, a widows' and orphans' fund, appropriated exclusively to the support of the widows and orphans of deceased members. After a time, and after considerable opposition, the District Grand Lodge adopted an endowment plan by which the sum of $1000 was to be paid to his widow and children upon the death of a member, thus practically introducing a system of mutual or co-operative life insurance. The money to pay these endowments was raised by assessments upon all the members of the subordinate Lodges, and the Grand Lodge acted simply as a receiving and disbursing agent;—thus, upon the death of a member, his Lodge gave notice thereof to an officer of the Grand Lodge, who thereupon issued requisitions upon all the Lodges in the District for their respective *quotas*, and upon receiving the money, transmitted it to the Lodge of the deceased member to be paid to his widow or children, or to the beneficiary designated in his endowment certificate. In order to strengthen this system, an amendment to the endowment law was adopted in 1874, to the effect that a certain portion of the amount assessed upon the death of a member, should be paid as above stated, and the balance should be placed to the credit of a fund to be called the "Endowment Sinking Fund." This fund in each Lodge was entrusted to its *trustees*, who were required to give bond annually, and were empowered to invest the same with the accruing interest, in such securities as they may deem best; and it was further expressly provided, that "each Lodge shall have *control* of" this fund. These were the provisions of the endowment law as amended in 1878. By an amendment made in 1879, the trustees were directed to invest "in United States registered securities," and the word "*custody*" was substituted for the word "*control*," in the provision above cited. By another amendment made in 1882, a form of registration for the Government bonds was prescribed to the effect that they were "*subject to the order*

*of the trustees"* of the several Lodges. Such, in this respect, was the state of the endowment law up to February 7th, 1884. At this time, or on the 6th of July, 1884, the trustees of Jedidjah Lodge had in their possession, belonging to this sinking fund, $5200 in Government bonds, registered as above indicated, and $3997.66 deposited in a Savings Bank, and awaiting investment.

On the 7th of February, 1884, the District Grand Lodge, at a meeting held in Norfolk, Va., changed the form of registration, and directed that the bonds be registered *"in trust* for the Endowment Sinking Fund of *District Grand Lodge, No. 5."* The effect of this was, or was supposed to be by those who opposed it, to vest the equitable title to the bonds in the Grand Lodge, and practically to take its fund away from each subordinate Lodge, or at least to deprive such Lodge of all control over it; and Jedidjah Lodge, at a meeting held on the 6th of July following, by a very large majority of its members, refused to allow its bonds to be so registered. The same action was also taken by another large Lodge, and was defended upon the grounds first, that the Norfolk law was irregularly and illegally passed, and second, that the fund belonged to the Lodges, they having paid it in from their own means, and the Grand Lodge had no right to take it away from them by any legislation whatever.

Immediately afterwards, on the 10th of July, 1884, a small minority of the members of Jedidjah Lodge filed the original bill in this case against the *five trustees* of the Lodge. They also, but without any authority whatever, made the Lodge itself a party complainant with them. The main charges in this bill against the trustees are, that they have conspired with certain other members of the Lodge, fraudulently to deprive the Lodge and the complainants of all the funds in their hands, and to fraudulently divert them from the trust purposes to which they were devoted; that without any legal authority, they have

16 v. 65.

withdrawn those deposited in bank, and have openly and publicly declared that they have severed their connection with the Order, and intend to retain all said funds and use them for such purposes as they and their co-conspirators may agree upon. The Court, thereupon, and in accordance with the prayer of the bill, granted an injunction and appointed a receiver to take charge and possession of the Lodge and all its funds, and directed the defendants to deliver the same to him, subject to further order. The trustees promptly complied, by handing over to the receiver not only the bonds and money belonging to the sinking fund, but also a considerable sum, amounting to over $3000, which was a Lodge fund proper, and then answered the bill. In this answer they deny the conspiracy charged against them, and aver that whatever declarations may have been made by individual members of the Lodge as to their disapproval of certain things sought to be done therein, and as to their desire legally to sever their relations with it, they themselves never intended and never declared that they intended to retain these funds and use them for any other purposes than those for which they were raised, and for which they were entrusted to them. The defendants then moved to dissolve the injunction, and discharge the receiver. Under this motion a large mass of testimony was taken, in regard to which all that need be said is that, in our opinion, it entirely fails to sustain the material allegations of the bill to which we have referred. If, therefore, the case had been brought to a hearing upon the bill, answer and this testimony, the injunction ought, unquestionably, to have been dissolved, the receiver discharged, and the bonds and money restored to the defendants.

But another phase of the case is presented by what took place pending these proceedings. It appears that the District Grand Lodge, at a special meeting held on the 19th of August, 1884, *forfeited the charters* of these two

Lodges. After this and after the testimony had been taken, the Grand Lodge came in and filed " an original bill in the nature of a supplemental bill." In this bill, the complainant, after setting forth various sections of the laws and Constitutions of the Order, and averring the lawful forfeiture of the charter of Jedidjah Lodge thereunder, claimed that by reason thereof the funds in the hands of the receiver have become vested in and now belong to the complainant, and that it is entitled to the possession of the same. It also avers that the charter of Jedidjah Lodge having been thus forfeited, the complainant is the only body under the laws and Constitutions aforesaid, to whom the Court can turn over these funds and securities, and for this reason it has become necessary for it to intervene in this case by way of a supplemental bill, and make claim to the ownership, possession and custody thereof. The prayer of the bill is for a decree directing the receiver to deliver these funds to the complainant, and for general relief. The parties made defendants to this bill are Jedidjah Lodge itself and two hundred and thirty-six of its individual members. The complainant, moreover, sues as " a corporation duly incorporated under the laws of the State of Maryland, " and the bill further alleges that, Jedidjah Lodge was likewise " a corporation duly incorporated under the laws of said State, and until the period of its forfeiture," on the 19th of August, 1884, " a subordinate Lodge of said District Grand Lodge, No. 5." One hundred and twenty-eight of the defendants in their answer to this bill admit that their Lodge was chartered under the laws of the State, and deny the right of any body of men to forfeit or annul that charter, or to take from them their property or money. They also deny all claim to the ownership or possession of these funds on the part of the complainant, as well as all charges of fraud or conspiracy on the part of the trustees or the members of the Lodge, and rely upon the proceedings heretofore taken in the case. Ninety-three of the defend-

ants answered, consenting to the passage of a decree as prayed, and fifteen filed no answer.

At the hearing the Court passed a decree directing the funds and securities in the hands of the receiver to be delivered and restored to the custody of Jedidjah Lodge, dismissing both the original and supplemental bills, without prejudice, dissolving the injunction, and discharging the receiver. From this decree, the District Grand Lodge, the complainant in the supplemental bill, has appealed.

As the case is thus presented, we do not see how it is possible to reverse this decree. The Act of 1852, ch. 231, under which Jedidjah Lodge was incorporated, vested it with the usual corporate powers, including that of holding, using and disposing of property, real and personal, to the amount of $50,000; and the Legislature reserved to itself the right "to modify, amend or annul the charter of any corporation that may be formed or established under and by virtue of this Act." Nothing can be plainer than the proposition, that the charter thus granted by the State cannot be forfeited by the Grand Lodge, whether acting in its conventional or corporate capacity. That charter can be annulled by the Legislature, or forfeited under such proceedings for that purpose as are authorized by statute or by the common law, and in no other mode, nor by any other agency. The utmost effect, therefore, that can be attributed to the action of the Grand Lodge on the 19th of August, 1884, is the forfeiture of the documentary or conventional charter which it granted to the appellee in December, 1853. But the appellee and the other defendants to the supplemental bill stand upon this State charter, which is still in force. They hold the funds in controversy, and have the right to hold them under the corporate powers thus conferred, and they so hold them, entirely unaffected by the forfeiture, by virtue of which alone the appellant, in its supplemental bill, claims them. The affirmance of the decree may, therefore, be

The Farmers & Merchants' Nat. Bank of Balto. *vs.* Jenkins.

well rested on this ground, without reference to the doctrine, that a Court of equity never lends its aid to the enforcement of forfeitures and penalties.

*Decree affirmed.*

(Decided 11th March, 1886.)