THE MARYLAND AND VIRGINIA ELDERSHIP
OF THE CHURCHES OF GOD, ET AL. *v.*
THE CHURCH OF GOD AT SHARPS-
BURG, INC., ET AL.

[No. 87, September Term, 1967.]

*Decided May 9, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, FINAN and SINGLEY, JJ.

*Robert J. Martineau,* with whom were *Walsh, Fisher &
Martineau, Lynn F. Meyers* and *James H. Booser* on the brief,
for appellants.

*Omer T. Kaylor, Jr.,* with whom were *Kaylor, Spence &
Hovermale* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The appeal in this interesting case was taken from an April
4, 1967, decree of the Circuit Court for Washington County

(McLaughlin, C. J.) in two companion cases dismissing the bills of complaint filed by the appellant, The Maryland and Virginia Eldership of the Churches of God (Md. & Va. Eldership), a Maryland corporation and others against the appellees, The Church of God at Sharpsburg, Inc. (Sharpsburg), a Maryland corporation and its called Pastor, and against the Indian Springs Church of God (Indian Springs), also a Maryland corporation and its acting Pastor, seeking to prevent Sharpsburg and Indian Springs from withdrawing from the Md. & Va. Eldership and to determine which of two factions involved in each suit should control the respective churches, their property and corporations. The other appellants in the Sharpsburg suit are several members of the Sharpsburg congregation and its appointed Pastor; in the Indian Springs suit the other appellants are two members of the congregation of that church. In addition to dismissing the bill of complaint, the Chancellor dissolved the temporary injunctions previously issued in the respective cases.

The facts, with certain reservations as to relevancy, are not disputed and are incorporated in an agreed stipulation filed in the suit.

The General Eldership of the Churches of God in North America (General Eldership) is a religious denomination organized in 1845 by John Winebrenner. It was incorporated on April 18, 1867, by an Act of the General Assembly of Pennsylvania. The Md. & Va. Eldership is one of the Elderships which make up the General Eldership, and was formed in 1872. It was originally incorporated in 1878 in Carroll County, Maryland and is presently incorporated by Articles of Incorporation recorded in Washington County on September 4, 1928.

Sharpsburg was organized sometime prior to 1872 and was one of the original members of the Md. & Va. Eldership. It continued as such a member until it withdrew in 1966. It was incorporated on May 20, 1881, and again on December 2, 1939. Harry S. Churchey, one of the appellees, was issued a Christian Worker's Certificate on October 13, 1922, an annual license on October 17, 1957, an annual Ordination Certificate on October 17, 1959, and on October 13, 1960, he was issued a Life Ordination Certificate authorizing him to serve as a Minister of God.

He was never appointed by the Md. & Va. Eldership to be the pastor at Sharpsburg, his last appointment being as pastor at Chestnut Grove and Knoxville on October 4, 1965. He was, however, "called" by Sharpsburg in June, 1966, and began his ministry there on July 17, 1966. Bennett G. Murray, one of the appellants and a plaintiff below, was appointed by the Md. & Va. Eldership to serve as pastor at Sharpsburg, but that church refuses to let him occupy the pulpit. Sharpsburg was conveyed land on September 29, 1938 by a deed to the Trustees of the church for use of the congregation. A clause in this deed provides "in the event the congregation of the Church of God at Sharpsburg ceases as a church organization, then all right, title and interest in the hereinabove described property shall immediately vest * * *" in the Md. & Va. Eldership, "a body corporate, its successors or assigns." The Sharpsburg church property is valued at $20,000 and was subject to a mortgage dated November 13, 1956, from the Trustees and the Md. & Va. Eldership. Neither the General Eldership nor the Md. & Va. Eldership contributed any funds for the purchase of this property which has not been repaid to them. At a duly called meeting of the congregation of Sharpsburg on June 26, 1966, a majority of those present voted to withdraw from the Md. & Va. Eldership. The vote was properly recorded. The appellants deny the effectiveness or propriety of this action.

Indian Springs was originally incorporated on March 30, 1929, under the name "The Indian Springs Union Church and Sunday School Association of Washington County." The Articles of Incorporation were recorded in Washington County and were amended on March 1, 1962, to change the name of the corporation to its present name "Indian Springs Church of God." Indian Springs was either a member of or was affiliated with the Md. & Va. Eldership from 1943 to 1966, having been formally admitted to membership in 1946. Mervil Stambaugh, one of the appellees and a defendant below, received his Christian Worker Certificate from the Md. & Va. Eldership in 1963, his annual license in 1964, and his annual certificate in 1965. He was appointed pastor at Indian Springs by the Md. & Va. Eldership in 1964 and was reappointed, at the request of that church, in 1965. Indian Springs owns two parcels of land: (1)

the church building conveyed to the Trustees of the church on April 8, 1953, by a deed which provides in part that if the church should become extinct or cease to be, the property should be the property of the Md. & Va. Eldership; this property is valued at $30,000 and is subject to a mortgage of approximately $4,000, and (2) the parsonage property conveyed to the Trustees on April 14, 1962, by a deed containing no reversion clause whatever; the parsonage property is valued at $14,000. Neither the General Eldership nor the Md. & Va. Eldership contributed any funds for the purchase of these properties. A majority of the congregation at Indian Springs and its pastor Stambaugh on July 10, 1965, voted to withdraw from the Md. & Va. Eldership. The meeting was properly called and the vote was properly recorded. The appellants deny the effectiveness or propriety of this action.

On July 29, 1966, the executive committee of the Administrative Council of the General Eldership gave a "judgment" that all persons who voted to withdraw from the Md. & Va. Eldership have:

"* * * abandoned and forfeited all rights, privileges, properties and offices in the local church and in the Churches of God * * *. In each local church the members who continue to adhere and submit to the doctrines and the policy of the denomination constitute the true congregation. The Executive Committee, as the duly constituted supreme court of the Churches of God, so determine, reaffirming that the presbyterial polity of the Churches of God recognizes no right of secession on the part of congregations affiliated with the denomination * * *."

The appellees deny the effectiveness of this action.

On July 30, 1966, the Md. & Va. Eldership revoked the annual ordination certificate issued to Harry S. Churchey, expelled him from the Md. & Va. Eldership, and denied him the right and privilege of preaching in and administering any of the churches and property of the Eldership. The Eldership also expelled from it all persons who participated in the withdrawal of a congregation from the Eldership. On the same day it took the same action against Mervil Stambaugh. Since that

date the church councils of Sharpsburg and of Indian Springs have refused to recognize any authority of the Md. & Va. Eldership over the respective churches. Sharpsburg has continued to employ Harry S. Churchey as pastor and has refused to accept Bennett Murray as pastor; Indian Springs has continued to employ Mervil Stambaugh as pastor and has refused to accept Bennett Murray as pastor.

After their admission and until 1965, both Sharpsburg and Indian Springs accepted appointments as pastors of persons appointed by the appropriate committee of the Md. & Va. Eldership, sent delegates to the annual sessions of the Md. & Va. Eldership and paid assessments made against the local churches for the General Eldership and the Md. & Va. Eldership. The appellees deny the relevancy of these facts.

Copies of the Articles of Incorporation of the General Eldership, the Md. & Va. Eldership, Sharpsburg and Indian Springs are part of the stipulation of facts and specific references to these documents will be made later in this opinion. There are also copies of other documents, books and other data to which reference will be later made.

Two questions are presented to us for decision:

1. Under the applicable statutes of the State of Maryland, the provisions of the Constitutions of the Md. & Va. Eldership and the General Eldership, the corporate charters of Sharpsburg and Indian Springs and the deeds of property to the trustees of the local corporations, may a majority of the congregation withdraw from the denomination and retain control of the property of the local church and the church corporation?

2. Did the decision of the Chancellor violate the First and Fourteenth Amendments to the Constitution of the United States?

We are of the opinion that the first question must be answered in the affirmative, the second in the negative and that the decrees of the Chancellor should be affirmed.

## 1.

The principal issue in the present case involves the question of whether the property of the two local churches is controlled by trustees of the local churches representing the majority of the congregation of those local churches. The two local churches

were incorporated under the General Religious Corporation Law of this State, now Code (1957), Article 23, Sections 256 to 270. The present General Religious Corporation Law is based upon and largely follows the original legislation on this subject, i.e., the Act of 1802, chapter 111. The present law provides in effect that in *every* church, religious society or corporation of whatever sect or denomination "protected in the free and full exercise of its religion by the Constitution and laws" of the State there shall be power and authority in all persons above 21 years of age belonging to "any such church, society or congregation" to elect certain persons, not less than four nor more than twenty-five, who when elected "shall be constituted a body politic or corporate to act as trustees in the name of the particular church, society or congregation for which they are respectively chosen, and *manage the estate, property, interest and inheritance of the same.*" (Emphasis supplied.) By the provisions of Section 257, the trustees are given perpetual succession by their name of incorporation and very broad powers in regard to the corporate property. The trustees may purchase and hold the property and "use or lease, mortgage or sell and convey the same in such manner as they may judge most conducive to the interest of their respective churches, societies or congregations," with a provision that they shall not sell, mortgage or dispose of property held by the corporation under an instrument prohibiting such sale. There are provisions for election of trustees, how their succession is maintained, with a provision that the minister or senior minister shall be a member of the corporation, *ex officio,* as well as provisions for the arbitration of contested elections, provisions for the adoption of a plan, agreement or regulation at the first election of trustees, its acknowledgement and entry in a book required to be kept, the recording of the plan, agreement or regulation with the Department of Assessment and Taxation and the procedure for amendment.

Several denominations have specific provisions in Article 23 in regard to their organization and the holding of property. The Roman Catholic Church has provisions in Sections 271 to 274 for the incorporation of its parishes, the ordinary (the Archbishop), the vicar-general and the pastor of the congrega-

tion together with those persons appointed by the ordinary, are designated as incorporators. Sections 275 to 297 relate to the Protestant Episcopal Church in the Diocese of Maryland and are basically the provisions of the original Vestry Act, i.e., Act of 1798, chapter 24.[1] Sections 298 to 312 contain the provisions of a new act relating to the Protestant Episcopal Church in the Diocese of Easton (consisting of the nine Eastern Shore counties of Maryland), but this Act is not applicable in the Diocese of Maryland. Section 313 relates to the formation of corporations of the Methodist Church and Section 314 provides for the formation of corporations of the Presbyterian Church in the United States.

It is clear that when a congregation is incorporated under the General Religious Law applicable to *all* religious groups, the trustees and the local congregation own and control *the property* of the local church. There is no provision in the General Religious Law that the local congregation conform to or follow any particular religious tenet or doctrine and it is apparent that it would be inappropriate for the General Assembly to have made such a provision. In short, the General Religious Law is concerned with the ownership, use and disposition *of property,* not with any religious theories, doctrines or tenets. So far as the Maryland statutory law is concerned, there seems little doubt that the trustees and congregations of the local churches are entitled to own, use and control the property of the respective corporations.

The charters of the respective local churches plainly confer the ownership, use, management and sale of the property of the local churches on the corporations and their trustees, subject to the provisions of the local by-laws. The stated purposes of the corporations are to "form a church organization or congregation to bring to the people of the community a vital knowledge of Jesus Christ as Lord and Savior and to promulgate the

---

1. Separate congregations may, however, be incorporated under the General Religious Law and become affiliated with the Protestant Episcopal Church even though they have not been originally incorporated under the Vestry Act itself. See "Parishes of the Diocese of Maryland," (1960), by the Reverend Doctor Nelson Waite Rightmyer.

Gospel of the New Testament Scriptures" (Sharpsburg) and "to provide its members (of the corporation) with the preaching of the Word of God, the administration of the ordinances, the facilities for public worship and the exercise of Christian discipline and to adopt and prosecute from time to time new measures as are in harmony with the spirit and teaching of the Word of God as shall tend to promote the Kingdom of God in this World" (Indian Springs). "The business and property of the Corporation shall be conducted and managed by a Board of not less than five * * * Trustees * * *" (Sharpsburg) and "the Trustees shall, in conformity to the law, control all property belonging to said congregation" (Indian Springs). In Section Three, subsection (e) of the Sharpsburg Charter appears the following:

> "The Corporation shall have all the General Powers conferred by Chapter 334 of the Laws of the General Assembly of Maryland, Acts of 1924, or any amendments thereto, and the enumeration of specific powers in this Certificate of Incorporation are in furtherance of and not in limitation of the General Powers conferred by law."

In Section 3 of the Charter of Indian Springs, it is provided:

> *"The congregation of this Church shall be and remain an independent congregation and may own and dispose of property, both real and personal,* as said congregation in accordance with its By-Laws and ordinances shall deem proper. This congregation and church may from time to time as may be deemed fit associate itself with such church denomination as it may deem desirable *but such association shall in no wise effect this Corporation in its ownership and control of its real and personal property, which shall be and remain in the properly constituted officers of this Corporation."* (Emphasis supplied.)

In neither charter is the Md. & Va. Eldership or the General Eldership mentioned.

The question then arises in regard to whether the trustees and the local congregation have lost the rights conferred by the

General Religious Law and their respective corporate charters for the ownership, use and control of the property of the local churches because of their withdrawal from the Md. & Va. Eldership after a regular vote of the majority of the respective congregations.[2] In considering this rather narrow question, it will be helpful to review the law in regard to the jurisdiction of courts in the United States in religious disputes and the exercise of such jurisdiction.

Our predecessors have held, in accordance with the law generally in this Country, that in regard to matters involving spiritual affairs the Maryland courts have no power to interfere. Such matters "must be left with the authorities of the church or denomination who have the power, by custom and usages of the ecclesiastical organization, to consider and determine upon them." *Shaeffer v. Klee,* 100 Md. 264, 271, 59 A. 850, 852 (1905). In short the courts, wisely we think, will not enter a "theological thicket." The Supreme Court of the United States in the case of *Watson v. Jones,* 80 U. S. (13 Wall) 679, 20 L. E. 669 (1872) declined to follow the English cases and especially *The Attorney General, ex rel. Mander v. Pearson,* 3 Mer. 353, 36 Eng. Rep. 135 (Ch. 1817), which held in an opinion by Lord Chancellor Eldon that there was an *implied trust* on the part of those who gave the property to the local church that the trust *res* would be used for the promulgation of the faith and doctrines in effect when the property was given, even though there was no express provision to that effect in making the gift. Mr. Justice Miller, for a majority of the Supreme Court, pointed out that the English precedents were not persuasive in that Eng-

---

2. The testimony and documents do not indicate the *size* of the majorities. In the Chancellor's opinion it is indicated in Note 1 to his opinion that there were 34 members of the congregation at the Sharpsburg meeting, 32 of whom voted to withdraw, one voted against and one vote was discarded. In Note 2 of the Chancellor's opinion it was indicated that at the Indian Springs meeting there were 25 members, 18 of whom voted for withdrawal and seven against. As there is no support for these figures in the testimony and documents we will not consider them, in view of the stipulation that a majority of the members of each congregation voted at a regularly called and conducted congregational meeting to withdraw from the Md. & Va. Eldership.

land had an Established Church and the English cases were related to that concept, largely repudiated in the United States.

When *rights of property* are involved, however, the courts, of necessity, must proceed to consider and adjudicate those rights not only to solve the particular case and the rights of the litigants before them, but also to preserve definiteness and order in the holding of property by religious corporations. Mr. Justice Miller in *Watson* recognized this and indicated three general classifications in regard to property held by religious bodies as follows:

> "The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies, may, so far as we have been able to examine them, be profitably classified under three general heads, which of course do not include cases governed by considerations applicable to a church established and supported by law as the religion of the state.
>
> "1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.
>
> "2. The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.
>
> "3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." (80 U. S. (13 Wall.) at 722-23).

The third classification appears to be modified by a subsequent decision of the Supreme Court of the United States which

indicates that there must be an element of fairness in the decisions of the church tribunals. See *Gonzalez v. Archbishop*, 280 U. S. 1, 50 S. Ct. 5, 74 L. E. 131 (1929), in which Mr. Justice Brandeis, for the Supreme Court, stated:

> "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." (280 U. S. at 16).

And see *Master v. Second Parish of Portland*, 36 F. Supp. 918 (D. Me. 1941), aff'd. 124 F. 2d 622 (1st Cir. 1941). See also the helpful notes entitled *Judicial Intervention in Church Property Disputes—Some Constitutional Considerations*, 74 Yale L.J. 1113, 1119-1121 (1965); and *Judicial Intervention in Disputes Over the Use of Church Property*, 75 Harv. L.Rev. 1142 (1962).

In considering questions in regard to the use of church property it is usually important, in the absence of express language in the deed conveying the property or making the gift, to consider the "polity" or form of church government which the particular denomination has. In the note in 75 Harv. L.Rev., at pages 1143-4, the three general types of church polity are defined as follows:

> "At least three kinds of internal structure, or 'polity,' may be discerned; congregational, presbyterial, and episcopal. In the congregational form, each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories—presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the episcopal form power reposes in clerical superiors, such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical, as opposed to congregational polities, in which the autonomy of the local congregation is the central principle." (Footnotes omitted.)

In many of the hierarchical churches there may be provisions in their Constitutions, Canon Law or other controlling documents or statutes which make it clear that the property is held in trust for the uses of the parent church and its discipline and appointments. See, for example, Article 23, Section 313 (e) in regard to the holding of property in the Methodist Church. There may be a requirement that the local church include provisions in the deeds to its property that it is held in trust for the parent church in conformity to its worship, doctrine and discipline and, upon a departure therefrom, the property will revert to the hierarchical body. Even in the absence of such an express provision in the deeds to the local church property, there may be an implied consent by the local church that the local property is so held if the constitution, by-laws, canon law or statute provide to that effect. It thus appears that there are three methods by which a hierarchical denomination may maintain control of local church property:

1. It may require reverter clauses in the deeds to the property of the local churches.

2. It may provide in its constitution or by some other authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by a local congregation with an implied consent by the local church to this provision.

3. It may obtain from the General Assembly an act providing for such a result.

As we will later consider, the Church of God did not use any of these three possible means to obtain control of local church property.

A denomination need not adhere strictly to any one of the three polities mentioned—episcopal, presbyterial or congregational. It may avail itself of parts of one, two or even all three. An example of the last possibility is the Protestant Episcopal Church in the Diocese of Maryland, which has a bishop as part of an episcopal polity, but is governed on a diocesan level by the bishop and the convention consisting of the clergy and certain elected laymen (a characteristic of presbyterian polity), but, under the provisions of the original Vestry Act and in the present Maryland statutes in regard to that church, the control

of parish or local church property is in the hands of the Vestry or trustees for the local church or parish. See Article 23, Section 304. The power to call a priest as rector for the local church or parish is also given to the Vestry subject to certain conditions with the right to contract with the priest in regard to salary, duration of the employment and other matters. It is thus seen that merely because a denomination has some of the characteristics of one type of polity, some of the characteristics of other polities are not excluded. This is the situation in regard to the Church of God.

As the Church of God does not have bishops, it obviously does not follow an episcopal polity. It does, however, have some and perhaps more of the characteristics of the presbyterial polity in that there is a governing body beyond that of the local congregation consisting of elders, the ordained ministerial elders (teaching elders) and the elected lay persons (ruling elders) and a general eldership over all of the intermediate elderships. This does not, however, exclude the use of a congregational polity so far as the use and control of property of the local congregation is concerned, and an examination of the Constitutions and other documents of the Md. & Va. Eldership and of the General Eldership indicates that this is the case.

In the Constitution of the General Eldership there is no statement in regard to the ownership or control of church property. Apparently any such provision was deliberately omitted since there was attached to the Constitution of the General Eldership a statement under the heading of "Important Information" in which two resolutions are quoted as follows:

> "1. Resolved, That this General Eldership *recommends* to all the brethren in the Churches of God to have their Bethels or meeting-houses parsonages, etc., deeded to the elders or trustees of their respective *local churches*, and their successors in office, to be held by them in trust for the *church*.

> "2. Resolved, That we also *advise* them to have inserted in the deed a provisionary clause, providing that in case the Church *becomes extinct or ceases to maintain an organization* in harmony with the doctrines and

polity of the Churches of God in North America, the property shall revert to the annual Eldership of which the church is a part." (Emphasis supplied.)

It will be observed that these resolutions are not part of the Constitution of the General Eldership and, in any event, are *advisory* only. The Md. & Va. Eldership did not accept this "advice," but, on the contrary, in its Constitution in Article XVII—"Deeds" provides as follows:

"Local church property, whether personal or real, shall be deeded to *the trustees of local churches and their successors in office,* with this proviso: That should the church *become extinct, or cease to be,* the property shall be the property of the Maryland and Virginia Eldership, a body corporate, to be disposed of at its pleasure." (Emphasis supplied.)

Nor do the deeds for the properties of the local churches provide for their reverting to the Md. & Va. Eldership if the congregation withdraws from that Eldership. The deed to the Sharpsburg church recites in the habendum clause that it is held by the trustees and their successors "in trust for the use of the congregation of the Church of God at Sharpsburg, Maryland," and—

"* * * in the event the congregation of the Church of God at Sharpsburg, Maryland, *ceases to function as a church organization,* then all right, title and interest in the hereinabove described property shall immediately vest in the Maryland and Virginia Eldership of the Churches of God in North America, a body corporate, its successors or assigns." (Emphasis supplied.)

One of the Indian Springs deeds has a provision that if the church should *become extinct or cease to be* the property reverts to the Md. & Va. Eldership; the other Indian Springs deed (for the parsonage) contains no reverter clause whatever. It is abundantly clear from these facts that the Md. & Va. Eldership did not even recommend a reverter clause if there was a departure from doctrine or a withdrawal from the Eldership, but did recommend such a reverter if the local church became ex-

tinct or ceased to be, a quite different situation from the withdrawal and continued active existence of the local church. There is, therefore, no applicable provision for reverter or forfeiture of the property of the local church to the Md. & Va. Eldership in the event of withdrawal by the local church from the Eldership. The control of the local church property by the local church, its trustees and corporation given by its charter, its deeds and the Maryland General Religious Corporation law continues.

S. G. Yahn, D.D., the editor of The Church Advocate and well versed in the polity of the Church of God, published a book entitled, "Polity of the Churches of God in North America" in 1929. After setting out the three general forms of church government already mentioned—Episcopal, Presbyterial and Congregational—Dr. Yahn indicates that the church government of the Churches of God "is not strictly speaking analogous to that of of the Presbyterian denomination," and points out the differences between the two systems of government of those two denominations. He also contrasts the government of the Churches of God with the government of the Methodist Church, but points out that the Churches of God have no bishops. In conclusion on this aspect of the matter he stated:

> "From this brief glance it will be seen that our church polity is a *combination of principles and provisions to be found in different religious bodies,* but not in any one of them in exactly the same combination. It is the product of a *selective process designed to meet our needs as a religious body.* And that it has served this purpose satisfactorily is a tribute to those who formed our first ecclesiastical organization." (Emphasis supplied.)

So far as the appointment of pastors is concerned and other related matters, the Churches of God are generally "presbyterial" in operation as Dr. Yahn states and as the Constitutions of the General Eldership and Md. & Va. Eldership show, but when the local congregations withdrew from the Md. & Va. Eldership this religious authority of the Eldership ceased and, thereafter, neither the Md. & Va. Eldership nor the courts could impose this religious principle upon those congregations. The

only question then for the courts to determine is who controls the local church property and, as we have seen, the Constitution of the Md. & Va. Eldership does not purport to change or interfere with the control of the local church when a schism arises and the local church withdraws. We need not inquire into why the Md. & Va. Eldership did not do this;[3] we only need to determine that it did not. Indeed, there are those who are of the opinion that schism is a good and necessary thing for the natural and proper growth of the church. See Zollman, *American Church Law* (1933) where it is stated in §262 (pages 250-51):

> "Schisms are as old as the church itself, continuously occur, and are analogous to the process of breaking and reforming by which a glacier makes its slow way to its destination. They are as necessary to the growth of the church as the fissures on the outer bark of trees produced by the expansion of the living tissue below. While viewed by many as a curse, while dissensions over questions of doctrine have been called a greater misfortune to a church than the destruction of its first meeting house by fire and that of its second by a tornado, they are in fact a blessing in disguise. They are an indication of life and a hopeful rather than a distressing sign. They are the process by which the living church continually adapts itself to the living society upon which it operates. With all the wastage incident to them, with all the heartache and headache which

---

**3.** It may be, of course, that inasmuch as the Church of God was established in 1825 by a schism led by John Winebrenner there is a certain delicacy on the part of the Elderships in dealing too harshly with the departing brothers. Then too, in view of the Scriptural Commands in the New Testament to "love your enemies" (Lk. 6:27), to "offer the other cheek" (Lk. 6:29) and "bless them which persecute you" (Rom. 12:14), it might well be thought wiser and more consistent with the New Testament teaching to permit the withdrawing brethren to depart in peace, especially as the Kingdom of the Founder of the Faith "is not of this world" (John 18:36). There is, however, nothing in the record to indicate the reasons for not providing for the reverter of local church property in the event of withdrawal from the Eldership.

they cause, they are necessary to the natural growth of the church in the fulfillment of its proper mission." (Footnotes omitted.)

If a denomination with an episcopal or presbyterial polity does not adhere to Zollman's view it may, as we have seen, easily prevent the withdrawing congregation from taking with it the local church property if it takes the action we have suggested. In the absence of such action, the local corporation, which under the law of Maryland and the deeds to the local property controls that property, continues this control. There is no financial loss to the Elderships as it was stipulated that neither of the Elderships had "contributed any funds to church property which have not been repaid to them."

Our decision in *Hayman v. St. Martin's Evangelical Lutheran Church*, 227 Md. 338, 176 A. 2d 772 (1962), although not entirely in point with the present case, is persuasive. In that case it was pointed out that St. Martin's Evangelical Lutheran Church of Annapolis was established in April, 1874, as the German Evangelical Lutheran Church. After its then charter expired, it continued to function as an unincorporated religious society affiliated with the German Evangelical Synod of North America. After the consolidation of that Synod with the Reformed Church to form the Evangelical and Reformed Church, St. Martin's continued its affiliation with that group. In 1949 St. Martin's was incorporated under the Maryland General Religious Law—and adopted a charter and by-laws. Its by-laws provided that:

"This congregation is, and shall be, a member of the Evangelical and Reformed Church or its successors. Withdrawal from the Church can take place only if two-thirds of the voting numbers of the congregation present at a meeting called for this purpose shall favor such withdrawal." (227 Md. at 342.)

The Evangelical and Reformed Church and the Congregational Christian Churches decided to form the United Church of Christ. The constitution and by-laws of the new denomination provided for the right of the local church to adopt its own charter and by-laws and to control its own property. By a vote of 173

to 34 the congregation of St. Martin's decided to sever its relationship with the Evangelical and Reformed Church to avoid the consolidation with the Congregational Christian Church and to apply for affiliation with the United Lutheran Church. In the by-laws of the Evangelical and Reformed Church, added in 1934 prior to the incorporation of St. Martin's, it was provided that if a congregation withdrew from the church the property should revert to the judicatory immediately above, but this provision did not apply to congregations who at that time did not provide for such reversion, so that the reverter provision did not apply to St. Martin's. These by-laws also provided that the "property of the congregation * * * shall be under the care of the trustees * * * who shall hold the property as a sacred trust for the congregation." The Synod had recognized the minority as the actual church congregation at St. Martin's. The 34 minority members of St. Martin's congregation filed a suit to obtain a declaratory judgment that it was entitled to the church property and to direct the affairs of the church corporation. As in the present case, the minority of the congregation argued that the polity of the Evangelical and Reformed Church is presbyterial in character rather than congregational; that the parent body's rules control; and, that the relationship between the congregation and the parent church is contractual and hence the by-laws of the parent body control when inconsistent wtih those of the local congregation. The lower court ruled in favor of the majority and the decree setting forth this ruling was affirmed on appeal. Chief Judge Brune, for the Court, stated at 227 Md. 346-47:

"In short, we find no conflict between the charter and by-laws of the Evangelical and Reformed Church and those of St. Martin's which provide for the withdrawal of the latter body from the former.

"Appellants' second main argument is equally without merit and is, in fact, sufficiently met by what we have already said. It is quite a leap from the by-law provision, that the property of a local congregation is to be held 'in a sacred trust for the congregation' to the view that the minority, therefore, has the right to the

property. It seems clear that the 'congregation' means all the persons entitled to vote at the meetings of the Church. And, as has been stipulated here, there was no infirmity in the notices given for the meeting of March, 1960 and the right to vote thereat. The congregation duly elected trustees pursuant to Art. 23, § 256, Code (1957); and under § 257 the corporation owns all the property and the corporation is managed by the trustees elected by the congregation. The very terms of the by-laws of the Evangelical and Reformed Church to the effect that the property is to be held in a sacred trust for the congregation, rather than for worship in accordance with some particular set of doctrines, or in accordance with the Evangelical and Reformed Church's, or its successors', doctrines, seems conclusive of the issue. The fact is, that, as is demonstrated by the discussion of Art. 16 of Par II of the by-laws of the Evangelical and Reformed Church, St. Martin's was in a congregational, rather than a presbyterial, relationships with that body. When the congregation met in accordance with its validly adopted by-laws and the majority voted to withdraw, it instructed the trustees that they were no longer a part of the Evangelical and Reformed Church. The trustees control the church corporation which controls the property. Code (1957), Art. 23, § 257. In the absence of evidence to show that any restriction in the deeds to St. Martin's properties prevents such action on the part of the trustees, there can be no valid attack upon the action taken by the congregation. And, as has been seen, even assuming *arguendo* a 'contractual' relation between the parent church and the local church in which the parent church is supreme, the by-laws of the Evangelical and Reformed Church do not prohibit the action taken here."

The Court did not find it necessary to consider the ruling of the Chancellor that since St. Martin's was validly incorporated under Code (1957), Art. 23 §§ 256-270, the provisions of its charter and by-laws were superior to those of the Evangelical and Reformed Church, relying on *District Grand Lodge*

*No. 5 v. Jedidjah Lodge No. 7,* 65 Md. 236, 3 A. 104 (1886), and *Goodman v. Jedidjah Lodge No. 7,* 67 Md. 117, 9 A. 13, 13 A. 627 (1887).

The decision in the *St. Martin's* case establishes that even though a denomination may generally have a presbyterial polity, its relationship with a local congregation in regard to the property of that congregation may be on the basis of a congregational polity, and, further, if the by-laws of the parent body are not inconsistent with the provisions of the charter and by-laws of the local congregation providing for the control by the local congregation over its property, a minority of the congregation, although reorganized as the "congregation" by the parent body, is not entitled to the property of the local congregation and to control the local corporation.

This is basically the situation in the present case and we will apply the principles enunciated in the *St. Martin's* case to the case at bar. As in that case, we do not find it necessary to consider the argument of the appellees that because of incorporation of Sharpsburg and Indian Springs under the General Religious Law, their charter and by-laws would, in any event, be superior to those of the Md. & Va. Eldership.

The appellants rely heavily upon the case of *Winebrenner v. Colder,* 43 Pa. 244 (1862), which involved a dispute between John Winebrenner, the founder of the Churches of God, and his son-in-law James Colder over the right to control and occupy the Church of God in Harrisburg, Pennsylvania. In that case, the majority of the congregation desired to employ James Colder as pastor even though he had been expelled from the East Pennsylvania Eldership and was no longer recognized as a member of the Churches of God. The minority of the congregation decided to receive the person appointed by the East Pennsylvania Eldership as the pastor of the Harrisburg Church. The trial court decided that the appointee of the East Pennsylvania Eldership was the only person authorized to serve as pastor and enjoined James Colder and his followers from interfering with the minority group. This ruling was affirmed by the Supreme Court of Pennsylvania. There are several differences between the *Winebrenner* case and the case at bar. In the first place, there was no *question of the property* of the local congre-

gation involved. Secondly, the *local congregation had not voted to leave the parent body,* but a majority of the congregation nevertheless refused to accept the pastor lawfully appointed by the parent body. Thirdly, as is pointed out in the opinion in *Winebrenner,* "The state having prescribed no law for the action of any church, leaves each church or denomination to the guidance of its own law," (43 Pa. at 251) but, as we have seen, Maryland provides for incorporation of local congregations under the General Religious Law and if the control of the local church property by the local trustees is not modified by contract—express or implied—or otherwise, the provisions of the local charters and by-laws govern the ownership and control of the local church property and corporation.

The appellants also cite an unreported opinion of the Circuit Court for the County of Gratiot, Michigan entitled *Michigan Eldership of the Churches of God in North America, et al. v. Knight, et al.,* involving a dispute over the local church property of the New Haven Center Church of God, when the majority of the congregation voted to withdraw from the Michigan Eldership. In that case, there was evidence that in the constitution adopted by the local congregation in 1953 there was a provision that the local church declared that it was "fully in accord with the Michigan Eldership and the General Eldership in accepting the Word of God as our guide for church membership and government," and further that "members shall not teach contrary to the teachings of the Church of God in North America." There was no reference in the Circuit Court's opinion to any provision of the Michigan Corporation Law. In our opinion, the factual situation was different in the Michigan case from that presented in the present case and apparently there was no applicable Michigan Corporation Law analogous to the Maryland Corporation Law applicable in the case at bar. We do not find the decision of the Michigan Circuit Court persuasive.

## 2.

The appellants earnestly contend that the decrees of the lower court violate the First and Fourteenth Amendments to the Constitution of the United States as an "establishment of religion" or a "denial of the free exercise" of religion. We do not agree.

Assuming, arguendo, that the provision of the First Amendment that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" is applicable to the State of Maryland by the provision of the Fourteenth Amendment, it is clear to us that the provisions of Maryland's General Religious Corporation Law and the decrees of the lower court neither "establish religion" nor "prohibit the free exercise thereof." The first General Religious Corporation Law was enacted by the General Assembly by Chapter 111 of the Laws of 1802. It was re-enacted in substantially the same form by Chapter 471 of the Laws of 1868. The original Act of 1802 is not substantially different from the present provisions of the Code but in the original Act there was a provision which stated:

> "Nothing therein contained shall be construed, adjudged or taken to abridge or affect the rights of conscience or private judgment, or in the least to alter or change the religious constitution or government of any church, congregation or society, so far as respects or in any way concerns doctrine, discipline or worship."

See *Tarter v. Gibbs,* 24 Md. 323 (1866).

This provision clearly indicates that the provisions of the Act of 1802, applicable to any and all religious corporations, was not intended in any way to interfere with or "establish" the doctrines or discipline of any religious body. What was intended was to provide for the formation of religious corporations for local congregations which would hold, control and have power to dispose of *the property* of the religious corporations. The Act of 1802 and its successor acts in no way sought to establish any ecclesiastical polity. This was left to the corporations themselves. By the nature of the law in regard to the formation of corporations generally, the religious corporation formed under it is controlled by trustees elected by the local membership. This is true of all member corporations. This does not mean that the religious corporation thus formed may not by contract—express or implied—adopt a presbyterial or episcopal polity and, if this is done, may provide for the holding of the local church property subject to the provisions of the con-

stitution, charter or by-laws of a denomination and the action of the authoritative agencies of such a denomination. This, however, is accomplished by the will and action of the local corporation and is in no way imposed by the State through its General Religious Corporation Law. It is true that the General Assembly at the request or by acquiescence of the denomination involved has code provisions in regard to the government of the Protestant Episcopal Church, the Presbyterian Church in the United States and the Roman Catholic Church, but these provisions are not involved in the present case.

The appellants argue that, in effect, the General Religious Law has permitted Sharpsburg and Indian Springs to change the polity of the Md. & Va. Eldership from a presbyterial polity to a congregational polity and thus "establishes" a congregational polity or denies the "freedom of religion" of the Md. & Va. Eldership to govern the Churches of God under their jurisdiction by a presbyterial polity. As we see it, this argument begs the question as it assumes that the polity of the Md. & Va. Eldership, so far as the property of the local churches is concerned, is presbyterial, whereas, as we have indicated, that polity in regard to the property of the local church, is congregational. Indeed, if the General Religious Law of the State sought to impose a presbyterial polity upon the religious corporations formed under it, there would be grave danger of a possible "establishment of religion" or a denial of the "free exercise thereof." It is purely a coincidence that the ownership and control of property by the religious corporation formed under the General Religious Law is, prima facie, consistent with the government and polity of the Baptist and Congregational Churches and of the Jewish Synagogues. As we have indicated, no hierarchical denomination is required to have a congregational polity for the property of its local churches. If it chooses to have such a polity, this is entirely its own decision.

It is clear to us that only the ownership and control of property is involved in the present case, and not the doctrines or discipline of the Churches of God. Indeed, the record does not even disclose what is the nature of the doctrinal dispute between Sharpsburg and the majority of its congregation, and Indian Springs, and the majority of its congregation, on the one hand,

and the Md. & Va. Eldership, on the other. We cannot tell from the record who are the alleged heretics and who are the alleged orthodox. It is well that this does not appear, as the Civil Courts are properly wary of considering these matters. As the Chancellor aptly stated in his opinioin:

> "Nowhere in the pleadings, the oral arguments or the Briefs does the court find any explanations as to what prompted the withdrawals. It is to be presumed that none of the parties feel it necessary to involve the court in abstruse theological doctrines to reach a decision of the issues."

The appellants rely in support of their position upon the decisions of the Supreme Court of the United States in *Kedroff v. St. Nicholas Cathedral,* 344 U. S. 94, 73 S. Ct. 143, 97 L. E. 120 (1952) and *Kreshik v. St. Nicholas Cathedral,* 363 U. S. 190, 80 S. Ct. 1037, 4 L. E. 2d 1140 (1960). In our opinion, these cases are clearly distinguishable from the present case. In *Kedroff* a statute of the State of New York was involved which was passed by the Legislature of New York in 1945 to transfer control of the New York churches of the Russian Orthodox religion from the central governing hierarchy of the Russian Orthodox Church (the Patriarch of Moscow and the Holy Synod) to the governing authorities of the Russian Church in America, a church organization limited to the diocese of North America and the Aleutian Islands. The Russian Orthodox Church had always had an episcopal polity. This was not involved in the statute which, however, sought to transfer control of the New York churches from one governing body to another. The majority of the Supreme Court was of the opinion that this statute violated the Fourteenth Amendment as prohibiting the free exercise of religion. Later, after remand of the case, the New York courts found that the hierarchical authorities of the Russian Church were dominated by the Soviet Government and an appointee of such authorities could not validly occupy St. Nicholas Cathedral. These findings were reversed by the Supreme Court in *Kreshik,* holding, in effect, that the New York courts could not do what the New York Legislature was held not to be able to do in *Kedroff*. Both *Kedroff* and *Kreshik* involved

the right to appoint the church ministry and an attempt to transfer by state law the power of appointment from one group of church authority to another group. There is no action of the State of Maryland, either legislative or judicial, which sought to effectuate such a transfer in the present case. The General Religious Law applies equally to all religious corporations formed under it without regard to doctrine, discipline or other ecclesiastical matters. The action taken by Sharpsburg and Indian Springs was by a majority of the respective congregations exercising their rights and powers over the church property in accordance with the General Religious Corporation Law. The severing of the religious ties with the Md. & Va. Eldership was entirely their action in which the State of Maryland played no part, and which is not involved in this case.

It is apparent to us from the authorities that equity courts have jurisdiction over a church *property* dispute and that neither the First Amendment nor the Fourteenth Amendment prohibits this, even if peripheral doctrinal or disciplinary matters may be incidently involved. Either the majority or the minority must be held to control the local church property and the equity court must make the decision so that the property rights are lawfully established by judicial process rather than by possible self-help. As was aptly stated in 17 Yale L.J. 1113, *supra* at page 1129:

> "The Court could also have been saying in *Kedroff* that the New York Legislature had no power to determine the ownership of religious property because the first amendment bars the state from taking any part in religious disputes. Under this theory any decision in this area involves, to some extent, both an establishment of the religion of the winner and an interference with the free exercise of the loser. This reading would account for the first amendment language in *Kedroff*. The reference to *Shelly v. Kraemer* in *Kreshik* could then be taken to mean that involvement in religious disputes is forbidden to courts, as well as to legislatures. If followed to its logical conclusion, however, this argument would bar any court, including the Supreme Court, from deciding the case. * * *

"Further, a constitutional doctrine prohibiting courts from settling religious property disputes would have serious practical consequences. The state has a legitimate interest in keeping title and ownership in land settled and secure. This 'housekeeping' interest requires that the state know at all times the owners of property within its borders, so that injured persons may find responsible owners, and so that property may be freely alienable. The state also has an interest in affording to disputants some recourse other than the sword for settling their arguments, and the state alone has the authority to make and enforce judgments between such disputants. If only from a practical point of view, then, the first amendment should not be an absolute bar to a court's taking jurisdiction of a church property dispute." (Footnotes omitted.)

In the same article it is suggested as follows:

"Basically, the state can choose either of two main avenues of approach to these church property problems; it can set up more or less arbitrary rules of its own, declaring where, for the state's limited purposes, control will be said to lie, or it can look to the individual church's property rules and accommodate state law to these rules." (17 Yale L.J. at 1130.)

Under either of the suggested "avenues of approach" Sharpsburg and Indian Springs prevail in the present case. If the Maryland General Religious Corporation Law is considered to incorporate the arbitrary rules declaring where control of the local church property is, then these statutes clearly place title and control of the property in the local church corporation. If, on the other hand, the equity court will look to the denomination's property rules, here again the local churches prevail since the Constitution of the Md. & Va. Eldership provides that local church property should only revert if the local church becomes extinct. There is no prohibition on withdrawal of a local church and a provision for a reverter of the local church property if this occurs.

The appellants also rely on *Goodson v. Northside Bible Church,* 261 F. Supp. 99 (S. D. Ala. 1966), in which the District Court for the Southern District of Alabama declared unconstitutional an Alabama statue known as the "Dumas Act," which authorized a 65% majority of the adult members of a local church to sever unilaterally its relationship with the parent church. The Court held that this statute interfered with the presbyterial system of the Methodist Church in regard to ministerial appointments, and was an attempt by the Alabama Legislature to change "established systems of church ownership without regard to the ecclesiastical law of the denomination." There is no such attempt in the Maryland General Religious Corporation Law as each religious corporation is entirely free to affiliate with any denomination it pleases and becomes bound by its system of church ownership. In the present case, as we have indicated, there is no polity of the Md. & Va. Eldership in regard to the ownership and control of local church property which is contravened by the Maryland General Religious Law.

We are unable to perceive of any "establishment of religion" or "denial of the free exercise thereof" resulting from the Maryland General Religious Corporation Law or from the decrees of the lower court.

> *Decrees affirmed, the costs to be
> paid by the appellants.*